IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:13CV245

| | | |
|---|---|---|
| KEMIKA D. ALLOWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| CITY OF CHARLOTTE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court upon the Defendant's Motion for Summary Judgment. (Doc. No. 10). For the reasons stated below, this motion is granted.

**I.  Factual Background**

Plaintiff Kemika D. Alloway, an African-American woman, was hired by the City in April of 2008 as a Criminalist II in the Chemistry Section of the Charlotte Mecklenburg Police Department ("CMPD") crime laboratory.[1]  Matthew Mathis, a white male, was her supervisor. One year later, in March of 2009, Mr. Mathis was promoted to director of the CMPD crime lab and he nominated Plaintiff to succeed him as Chief Criminalist of the Chemistry Section.  Mr. Mathis remained Plaintiff's direct supervisor.  As Chief Criminalist, Plaintiff managed a staff of three employees.  In her position as Chief Criminalist, Plaintiff was subjected to performance standards which required her to: manage a caseload within her section; oversee the analytical, operational and quality processes of the section; supervise subordinates; display leadership skills; manage communication within the department and other agencies; complete administrative duties promptly; and comply with attendance requirements.

---

[1] At the time Plaintiff was hired, the CMPD crime lab was divided into five divisions: Chemistry, Biology, Latent Fingerprints, Firearms and Toolmarks, and Questioned Documents.

1

On February 14, 2011, Plaintiff sent a memorandum to Rodney Monroe, Chief of Police, entitled "Justification and Complaint" wherein she set out numerous concerns about her supervisor, Mr. Mathis. Nowhere in this complaint did Plaintiff state that she was being denied any term or condition of employment based on her race. Instead, Plaintiff stated that her section was understaffed and overworked, that Mr. Mathis would not let her purchase necessary equipment or assist with approving contracts for maintenance, and that Mr. Mathis had caused a rift between her and her subordinates by excluding her from meetings or meeting with her subordinates without her. Plaintiff's memo neither mentioned nor alluded to discrimination in any way.

On February 17, 2011, three days after giving her memo to the Police Chief, Plaintiff accused one of her subordinates, Criminalist II Jennifer Leiser, of sabotaging the results of an internal audit of the crime lab "for the sole purpose of causing the Chemistry Section to fail."[2] Plaintiff initiated an Internal Affairs ("IA") investigation into the matter.[3]

On March 16, 2011, Major Richard Williams sent a memorandum to Deputy Police Chief Ruth Story outlining the results of the IA investigation that was initiated by Plaintiff. In that memo, Major Williams outlined significant concerns regarding Plaintiff's performance, as follows: Adherence to Protocols, where Plaintiff violated several sections of the Quality Assurance Manual ("QAM"); low productivity; and inability to manage and supervise the Chemistry Section.

On March 16, 2011, the plaintiff was given notice by Deputy Chief Story that she was being recommended for termination and that, pursuant to City policy, there would be a pre-termination hearing on March 18, 2011, at which she had an opportunity to challenge the factual

---

[2] Each year, an internal audit is conducted to ensure that the lab is operated according to accreditation standards.
[3] The results of the IA investigation exonerated Leiser of any wrongdoing.

basis of her termination. Deputy Chief Story's notice cited the following reasons for Plaintiff's termination: failure to adhere to required lab quality control protocols resulting in notification to the American Society of Crime Laboratory Directors (ASCLAD/LAB), cases being dismissed from the D.A.'s office, failure to meet productivity standards, and failure to manage and supervise Chemistry Section of the Crime Lab. Shortly after plaintiff was terminated, the City hired an African-American female as her replacement.

Plaintiff filed a Complaint on December 18, 2012, alleging the following three causes of action: (1) the City's decision to terminate Plaintiff's employment was on the basis of race in violation of Title VII and 42 U.S.C. §1983; (2) the City discriminated against Plaintiff on the basis of her sex in violation of the Equal Pay Act of 1963, Section 1928 and Title VII by denying her wages equal to similarly situated co-workers; and, (3) the City retaliated against Plaintiff in violation of Title VII and Section 1983 when it terminated her after she complained about race discrimination. Defendant has moved for summary judgment and Plaintiff has subsequently indicated that she does not oppose Defendant's motion as it relates to her discrimination claim regarding pay and her retaliation claim. Thus, the only claim to be addressed is the race discrimination claim under Title VII and Section 1983.

**II.     Discussion**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). An otherwise properly supported summary judgment motion will not be defeated by the

existence of some factual dispute; however, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id.* at 248. A court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 574, 587 (1986).

The Fourth Circuit has clearly established that "[t]he non-moving party [has] the ultimate burden of demonstrating a genuine issue of material fact for trial. Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the non-moving party's case." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (internal citations omitted); *see also Othentic Ltd v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) ("The non-moving party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.'") (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

### A. Title VII claim

A plaintiff can establish a Title VII racial discrimination claim through direct proof of discrimination or through the application of the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by producing evidence that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was performing satisfactorily at the time of her adverse employment action, and (4) other employees who were not members of the protected class were retained under similar circumstances. *See Washington v. City of Charlotte*,

219 Fed. Appx. 273, 276 (4th Cir. 2007) (citing *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995).

If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to set forth a legitimate, non-discriminatory reason for the adverse employment action. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). To avoid summary judgment, the plaintiff must then produce evidence that the defendant's reason for the adverse employment action is pre-textual. *Id*. However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Plaintiff herein fails to establish a *prima facie* case because she cannot show that she was performing her job satisfactorily at the time of her termination. Moreover, she cannot show that other employees who were not members of the protected class were retained under similar circumstances.

As Chief Criminalist, Plaintiff was responsible for the day-to-day management of the lab's Chemistry Section and was also required to work as a chemist conducting drug and alcohol tests for criminal cases. Defendant has presented evidence that Plaintiff was terminated by the City for several reasons –each of which standing alone would support the City's decision to terminate her for objectively lawful reasons. The decision to terminate the Plaintiff arose from two distinct sources.

First, numerous breaches of quality control protocols committed by the Plaintiff were revealed during an internal audit. The CMPD Crime Lab has several quality control protocols in place to ensure the accurate analysis of criminal evidence. Each section of the lab has a Quality

Assurance Manual (QAM) that outlines the procedures for conducting chemical tests on evidence. The parameters contained in the QAMs are standards that the lab must adhere to obtain and maintain its accreditation standards, which are generally referred to as ASCLAD/LAB standards. The Chemistry Section of the lab also has its own internal Standard Operating Procedures that formalize additional steps that must be followed to ensure quality control.

During the IA, thirteen (13) of Plaintiff's cases were reviewed, and the investigator found that twelve (12) of her cases were not logged into the appropriate evidence management system (called "LIMS") until at least thirty days (30) after Plaintiff signed for the evidence. Seven of the cases showed that Plaintiff did not enter the case into LIMS until ninety (90) days after the evidence was signed out from the property room. Plaintiff's actions violated the chemistry SOP that all evidence "will be logged into LIMS using the date that the evidence is received."

Plaintiff admitted in her deposition that she understood that LIMS is the system that establishes accountability by ensuring the chain of custody of evidence is maintained and that the proper tests and reviews have been completed before a report is released. Plaintiff also admitted that if a chemist had received evidence on a particular date and did not log the evidence into LIMS on that date, it would be a violation of CMPD protocol. Defendant asserts that Plaintiff's failure to timely enter the date of receipt of evidence into the LIMS is not simply a clerical error of insignificant consequence. Instead, failure to accurately track evidence breaks the chain of evidence, which not only places the prosecution of criminal cases into jeopardy, it also places the Lab's reputation and accreditation into jeopardy. Moreover, lax record keeping stymies the District Attorney's office, Detectives, and her manager's ability to quickly track the status of a case which is one primary purpose of the LIMS system. Similarly, the reason to conduct an administrative review is not simply a technicality; rather, it is an essential check and balance

necessary to ensure that the prosecution can rely on the test to either move forward with a criminal prosecution or prevent an innocent person from being subject to prosecution for an innocuous substance.

Plaintiff attempts to deflect her failure to timely enter receipt of evidence by previously testifying that the entry time is skewed because each entry shows 12:00 am and speculating that someone else might have changed the dates. However, Mr. Mathis stated in his Affidavit that the LIMS system was specifically designed to comply with the ASCLAD/LAB recommendation to show only the day it was entered and not the exact time. Accordingly, when the date of receipt is entered, the time automatically sets to 12:00 a.m.

The IA investigation also revealed that in in two instances Plaintiff released reports before the mandatory administrative review was completed. By releasing the reports before the administrative review was complete, Plaintiff violated both QAM and ASCLAD/LAB standards, which require a lab to conduct independent reviews of a lab report before the report is released. Plaintiff's improper and premature release of the reports establishes that she signed the official report certifying to a court of law that she that she completed the tests performed when in fact the administrative test had not been completed.

The IA investigation also revealed that, in a review of thirty three (33) of Plaintiff's case files for 2010, twenty three (23) of the files were not in the crime lab file room, and seventeen (17) of these completed files had been closed for more than 30 days with 8 being closed more than 90 days. Other problems cited by Major Williams in his memo outlining the IA investigation include the finding that Plaintiff, on five separate occasions, allowed a personal friend and employee access to the crime lab, which is a secured area, without requiring the friend

to sign in as required. This is against lab protocol, and Plaintiff testified that she was aware that employees did not sign in, but took no action to correct this breach of protocol.

Moreover, a review of her case work indicated that she in fact used reagents to test MDMA (illegal controlled substance) during a period when her log was not kept up to date. The failure to keep her log current not only denies the prosecutor the ability to show that she followed proper protocol, but also increases the chance that a person is charged with possession of an illegal substance when in fact the substance is innocuous.

One of the most egregious of IA's discoveries was Plaintiff's lack of attention to quality control protocols that caused the Department to issue Corrective Action Reports to the agency that provides the Lab's accreditation. In one of these instances, Plaintiff incorrectly identified an innocuous substance as cocaine. Although Plaintiff attempts to categorize this mistake as a clerical error, her lack of attention to detail resulted in an innocent person being prosecuted for a crime (albeit for a short period of time) they did not commit. Because of this significant breach, CMPD had to report the violation to ASCLAD, and also prove to ASCLAD that it the breach was an isolated incident and that steps had been taken to prevent the error from occurring in future.

Defendant submits that the second overall deficiency in Plaintiff's work performance is that she failed to effectively manage personnel issues in her section. Plaintiff exhibited an inability to manage and supervise the Chemistry Section. In addition to demonstrating a lack of middle management leadership skills to get her unit functioning, she also contributed to the backlog of cases by not timely insuring that important equipment was validated so that the test results could be used in Court.

8

The Crime Laboratory maintains several sophisticated scientific machines. The Chemistry Section is part of CMPD and as such, all spending is controlled by a limited budget. The Manager for the Laboratory must seek approval for expenses above and beyond the Laboratory's line item budget. The maintenance of the equipment is crucial to prevent backlogs and ensuring evidence is ready for court. Plaintiff failed to order the correct parts and timely validate crucial lab equipment.

In response to Defendant's compelling evidence that Plaintiff's termination had nothing to do with her race and everything to do with her unsatisfactory job performance, Plaintiff argues that she was an effective leader because she helped reduce a backlog of drug cases between 2009 and 2010. She also argues that the error she made in falsely concluding that an innocuous substance was cocaine was an isolated "clerical error" and was actually someone else's fault; her performance evaluations, even after the error was reported to ASCLAD/LAB showed that her work performance achieved expectations; and that she properly purchased equipment for her section. She contends that her supervisor, Matt Mathis, undermined her position and allowed employees to question her management authority. She claims that she wrote the memo to the Police Chief because she was concerned about how she was being micromanaged. She argues that she followed proper protocol when she filed an internal complaint against one of her subordinates, and that the basis of the termination "included the error that she made on a report for which she had not been disciplined a year earlier [and] her inability to 'manage the department' and supervise the Chemistry Section." Finally, she contends that the LIMS cannot be relied upon to show that she committed numerous reporting errors.

Despite her contentions, Plaintiff offers no credible evidence to refute City's sworn statements and supporting documents that she: failed to adhere to numerous quality control

9

protocols; failed to properly store case files; repeatedly allowed an unauthorized visitor to enter and remain in the secured area of the criminal lab; failed to properly maintain a reagent log; failed to meet productivity standards for conducting tests on drug cases; failed to complete the Standard Operating Procedure for her section; and failed to properly manage her unit.

The uncontroverted evidence establishes that Plaintiff failed to follow critical quality control protocols. These failures in combination with the uncontroverted findings contained in Major Williams' report leave no room for a finding other than the Plaintiff's performance was unsatisfactory at the time of termination. Consequently, no reasonable jury could rule that Plaintiff's termination was a result of racial discrimination.

In addition to being unable to establish that she was performing her work in a satisfactory manner at the time of her termination, Plaintiff also fails the fourth prong of her *prima facie* case because she cannot identify any other employees who were not members of the protected class and who were retained under similar circumstances. Plaintiff asserts that a white employee, Ann Charlesworth, was actually responsible for reviewing the report in which Plaintiff made an error but was not disciplined as was the Plaintiff. However, Plaintiff fails to note that *she* was Ms. Charlesworth's direct supervisor and it was *her* primary responsibility to manage Ms. Charlesworth. Consequently, inference of improper motive for failing to discipline Ms. Charlesworth cannot be attached to the City. Moreover, Plaintiff has provided no evidence that Ms. Charlesworth violated quality control protocols with the same frequency and intensity as the Plaintiff. In addition, Plaintiff provides no evidence whatsoever establishing that other members of the lab who were not members of the protected class were retained under similar circumstances. Likewise, there is no evidence that any other member of the lab failed to follow numerous quality control protocols as frequently as the Plaintiff.

Because Plaintiff has failed to prove two prongs of a *prima facie* case of race discrimination, Defendant is entitled to summary judgment on that issue.[4]

**B.    Section 1983 claim**

In order to establish a claim under 42 U.S.C § 1983 Plaintiff must establish that: (1) she has been deprived of a right, privilege or immunity secured by the Constitution or laws of the United States; and (2) the conduct complained of was committed by a person acting under the color of state law. *See* 42 U.S.C.A. § 1983. Municipal liability under Section 1983 does not amount to *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (U.S. 1978). Consequently, a municipality is subject to Section 1983 liability only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury . . . ." *Id.* at 694. The requirement that the allegedly unconstitutional act stems from an established municipal policy or the actions of a final policymaker ensures that the municipality is "responsible" for the alleged violations of a plaintiff's constitutional rights. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Unless a government entity has a policy or custom of discrimination, a court will not attribute an individual's constitutional violations to the government entity. *Monell*, 436 U.S. at 694.

In a light most favorable to the Plaintiff, the material facts herein indicate a workplace where Plaintiff did not get along with her subordinates, and harbored animosity towards her direct supervisor. However, there is no evidence whatsoever that indicates that the City has a custom or policy of illegally discriminating against its employees. Consequently, Plaintiff's §

---

[4] Even if she could establish a *prima facie* case, she cannot show that Defendant's legitimate non-discriminatory reason for her termination was pretextual. In addition, the evidence shows that Plaintiff was replaced by another African-American female, further eroding her argument that the Defendant's termination reasons were pretextual.

1983 claim for race discrimination is legally insufficient to withstand the Defendant's Motion for Summary Judgment.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment is hereby GRANTED.

Signed: January 22,

Graham C. Mullen
United States District Judge